Filed 9/13/16  P. v. Ganthner CA3

### NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C073817 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF113807) |
| v. | |
| JOHN TIMOTHY GANTHNER, | |
| Defendant and Appellant. | |

A jury found defendant John Timothy Ganthner guilty of one count of sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 1),[1] four counts of child abuse (§ 273a, subd. (a); counts 3-6), and one count of forcible sexual penetration upon a child under the age of 14 (§ 289, subd. (a)(1)(B); count 7).  The jury also found true allegations defendant inflicted great bodily injury on a child under the age of 5 (§ 12022.7, subd. (d)) in the commission of counts 1, 3, and 7.  The jury

---

[1]  Further undesignated statutory references are to the Penal Code.

found defendant not guilty of torture (§ 206; count 2) and found not true a torture special circumstance allegation. (§ 667.61, subd. (d)(3).)

Defendant was sentenced to life in prison without the possibility of parole on count 7 under the "One Strike" law (§ 667.61, subd. (j)(1)), plus 11 years 8 months as follows: a consecutive four years (the middle term) on count 3, plus a consecutive 5 years for the great bodily injury enhancement; a consecutive one year four months (one third the middle term) on count 4; and a consecutive one year four months (one third the middle term) on count 5. The sentences on counts 1 and 6 were stayed pursuant to section 654.

Defendant's primary contentions on appeal are that there is insufficient evidence to support his convictions on the sexual penetration offenses (counts 1 & 7), and that his sentence of life without the possibility of parole on count 7 does not comport with section 667.61 and violates his federal right to due process of laws. He also contends that the trial court committed other instructional, evidentiary, and sentencing errors, and that he was denied effective assistance of counsel.

We shall conclude that defendant's sentence of life without the possibility of parole on count 7 must be reversed and shall remand the matter to the trial court for resentencing. We shall further conclude that defendant's convictions on two of the four child abuse counts (counts 4 & 6) must be reversed, and that defendant's sentence on count 5 should have been stayed under section 654. We shall affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Prosecution*

On Sunday, August 21, 2011, Vanessa M. took her two-year-old son Z. to stay with her mother, Christina M., and her mother's boyfriend, defendant, in Woodland for an unspecified period of time.[2]

On Tuesday morning, August 23, 2011, Christina and defendant took Z. to a nearby park. While they were there, Z. pooped in his diaper, and Christina and defendant took him home, where Christina changed his diaper. Around 10:00 a.m., Christina left Z. with defendant while she went to volunteer at a nearby shelter. After she had been at the shelter for an hour or two, she called defendant to check on Z. Defendant told her that Z. had fallen and that she should come home. Defendant also said that it looked like Z. "got butt raped." Christina immediately returned home.

Meanwhile, defendant sought the advice of their neighbor Deborah Roman-Whitehouse, who ran a nearby preschool. Defendant rode his bike to the Whitehouse residence and told Debbie's husband that he had been watching a small child who fell on some concrete steps and appeared to have injured his buttocks. Debbie, who was working at the time, went to Christina and defendant's home, which was a couple of blocks away. When she arrived, Z. was drinking a juice box and "seemed kind of out of it." She took off Z.'s diaper and saw that his "little scrotum was very large" and that he had a "huge cut" underneath his scrotum. She believed Z. needed to go directly to the emergency room.

When Christina got home, Z. was sleeping on his stomach with his buttocks in the air. She saw a wet ring on the diaper, so she lifted the back of his diaper and peeked inside. She saw "[r]ed. I mean, just swollen and red skin . . . ." Z.'s buttocks

---

[2]   Consistent with the parties' briefs on appeal, we shall refer to various witnesses by their first names. No disrespect is intended.

3

"[a]bsolutely [did] not" look like that two or three hours earlier when she changed him. Debbie's husband drove Christina and Z. to the hospital.[3] Christina told the doctors and nurses at the hospital that Z. had fallen, as defendant had told her.

That afternoon, Detective Greg Elliot of the Woodland Police Department was dispatched to the hospital based on a report of "a two-year old in the emergency room with rectal injuries." When he arrived, he took photographs of Z.'s injuries. Z.'s anus was swollen, and there was a trickle of red blood coming from the rectal area. His scrotum was red and swollen. Christina told Detective Elliot that she had left Z. in defendant's care while she went to volunteer her time, and that defendant told her that Z. "had fallen and injured his rectal area." Detective Elliot went to Christina's home and examined the steps where Christina believed Z. had fallen. There was no blood on the steps, and he did not "see anything on the step that [he] felt or believed could have caused [Z.'s] injury."

Later that day, Detective Francisco De Leon met with Christina and defendant at their home. Defendant told Detective De Leon that he was in the backyard shed when he heard Z. crying, and when he came out, he saw that Z. had fallen next to some steps. Defendant surmised that Z. was coming down the stairs when he fell and straddled one of the steps. Christina and defendant consented to a search of their home. Defendant told Detective De Leon that the diaper Z. was wearing when he fell was in a trash can under the kitchen sink. Detective De Leon found a discarded the diaper in the trash can; there was blood inside.

At 5:45 p.m. that evening, Z. was examined by Dr. Angela Rosas, a pediatrician specializing in child abuse and neglect. Dr. Rosas had been a pediatrician for 20 years, had been designated as an expert in child sexual and physical abuse cases about 250

---

[3] Christina and defendant were without a working car at the time.

4

times, and had examined about 3,000 children in child sexual and physical abuse cases. Once Dr. Rosas "realized [Z.] had a serious injury," he was taken to an operating room and put under anesthesia for the remainder of the examination.

Z. had "quite a bit of bruising around the scrotum and the area between the scrotum and the anus," called the perineum. His scrotum was "very abnormal" in that it was extremely swollen and had a lot of bleeding underneath the skin. Dr. Rosas opined that such an injury most often is caused by "blunt trauma, a forceful blow to the genital area," directed at the scrotum.

Z. also had some bruising on the tip of his penis. There was bruising around the edges of the foreskin, which extended down the penis underneath the foreskin. Dr. Rosas opined that the injury to Z.'s penis and scrotum "could be caused by the same mechanism, but it also could potentially have a separate mechanism." When asked what the second mechanism could be, Dr. Rosas indicated that the injury to the penis could have been caused by pinching, a bite, "or just sucking the end of the penis."

There also was a striped bruise pattern down the left side of Z.'s chest, which extended down toward his abdomen. Dr. Rosas opined that the injury likely was caused by blunt force trauma such as a kick or a stomp. Z. also had a striped bruise pattern on his left thigh, near his groin, which also was likely caused by blunt force trauma such as a kick or a stomp. When asked whether the same kick could have caused the injury to Z.'s chest and the injuries to his scrotum and thigh area, Dr. Rosas opined that there "would have to be at least two kicks, one to the chest and one to the scrotum and thigh area."

Dr. Rosas also found "extensive bruising about the anus," "swelling at the edge of the anus," and "lacerations or tears of the anus." In addition, the anal muscle was "patulous," meaning the muscle had lost its tone. Z.'s anus did not contract normally until about the third day he was in the hospital. There also was swelling and redness inside the anal canal itself. Dr. Rosas explained that the injuries to Z.'s anus were indicative of a "penetrating injury" and opined that Z.'s anus had been penetrated by a

5

large object. According to Dr. Rosas, the injuries to Z.'s anus could not have been caused by a kick, explaining that if "it was blunt trauma, the severity of the injury would be to the parts of the body that are most at the surface, . . . you wouldn't have bruising at the very edge of the anus or tearing to the anus or overstretching of the muscles of the anus." Blunt force trauma alone could not cause swelling and redness in the anal canal. Dr. Rosas could not be medically certain when the penetrating injury to Z.'s anus occurred. She did opine, however, that "the injuries would have been very obvious to anybody who saw the child's anus, such as doing a diaper change."

Dr. Rosas acknowledged that if Z. had been kicked in the buttocks and the toe of the person doing the kicking "went all the way in through the anus causing the anus to overstretch, that could cause the injury." She explained that if the person who did the kicking was wearing a shoe and the child was wearing a diaper, that would not be possible because the person would not be able to penetrate the child's anus.

Detective De Leon was notified of Dr. Rosas's findings the following day, August 24, 2011, and placed defendant under arrest later that same day.

A criminalist with the Department of Justice testified by stipulation that he reviewed anal rectal swabs collected from Z.'s body and detected no semen on the representative swabs. He also reviewed two smear slides obtained from the sexual assault evidence kit of Z. and observed no sperm cells on either slide.

A DNA analyst for the Department of Justice also testified. She analyzed two stains found in Z.'s diaper. A reddish-brown stain tested presumptive positive for blood and matched Z.'s DNA profile. A mixed DNA profile was developed from a yellowish-brown stain. Defendant was excluded as a minor contributor. She examined swabs collected from Z.'s penis, rectum, anus, and scrotum and found no foreign DNA. She also developed DNA profiles from penile and scrotum swabs collected from defendant's body. Z. was excluded as a contributor to any of the DNA collected from defendant.

6

*B.* *The Defense*

Defendant testified on his own behalf at trial. At the time of the incident in question, he and Christina had been together for five years. Vanessa called the house around 7:00 or 8:00 p.m. on Sunday, August 21, 2011. Christina was gone, and Vanessa asked defendant if he could meet her at the Woodland Mall and pick up Z. She was travelling by bus from Sacramento and wanted to catch the next bus back. Defendant agreed and rode his bike approximately two miles to the mall, met Vanessa, and picked up Z., who was asleep in a stroller. Defendant walked his bike home while pushing Z. in the stroller.

The next day, Christina cared for Z. Defendant could not recall anything extraordinary happening that day.

The following morning, they got up, had breakfast, and went to the park around 8:00 or 8:30 a.m. They were at the park for 15 to 20 minutes when Z. pooped his diaper, and they returned home. Around 10:00 a.m., Christina asked defendant if he could watch Z. while she left to do some volunteer work. He said, "sure," although he was not comfortable watching Z. by himself. Z. was playing when Christina left but began to cry about 10 minutes later, when he realized she was gone. When Z. was still crying 15 minutes later, defendant telephoned the shelter where Christina was working, but no one answered. Defendant then offered Z. something to eat and drink, but Z. would not accept either and continued to cry. Defendant did not receive any training in how to "deal with th[at]." He had observed Vanessa and Christina "wait him out" but had never seen Z. cry that long in the past and did not know what to do. He called the shelter a second time, and again no one answered. "That's when [he] snapped." He walked toward Z., who was laying face down on the floor, with his buttocks in the air and legs spread apart, and kicked him "in the diaper area" with the tip of his foot. He believed that he used "quite a bit" of force, and Z. moved six to eight inches. He kicked Z. two more times with the top of his foot, using less force. The kicks were less than one second apart. Defendant was

7

wearing tennis shoes when he delivered the kicks. Z. cried for two or three minutes and eventually fell asleep.

After kicking Z., defendant was "numb" and "in disbelief that [he] actually . . . kicked a defenseless child." About 15 minutes later, he felt the need to "get away," so he went into a shed in the backyard to get a bag of clothes he wanted to donate to a local clothes drive. While he was inside the shed, he thought he heard someone coming out the back door of the house. He called Z.'s name, walked a few steps, then heard a "clump" and Z. start crying. When he came out of the shed, he saw Z. lying on his side next to the steps. He picked Z. up, checked to see if he was alright, and took him inside. Defendant held Z. for a couple of minutes until he stopped crying, at which point he sat Z. down, and Z. walked into the front room. Z. eventually got into his bed, rustled around for 10 to 15 minutes, and then started to cry. Defendant thought he might be wet and checked his diaper. When he did, he saw "a lot of bruising around his anal area." The bruising he observed "wasn't near as bad, not even close" to what was depicted in the photographs taken by Detective Elliott and shown to the jury. Defendant explained, "[T]here was no purple shading from bruising. . . . [T]he only visible thing was the inflammation of the actual colon itself . . . -- [it] was quite large." Defendant was "shocked" and "had to sit down for a little bit and actually just go over what had happened . . . ." When Christina telephoned a few minutes later, defendant told her that Z. had fallen, and that she needed to come home right away. Defendant denied kicking Z. with the purpose of causing Z. pain. When asked why he kicked Z., defendant stated, "It wasn't something that I wanted to happen or was looking forward to happen or anything like that. It just happened in the way of I snapped."

Christina arrived home a few minutes later. Defendant showed her Z.'s injury, and she was shocked. Their neighbor Debbie said that Z. should be taken to the hospital, and her husband drove Christina and Z. to the hospital.

Detective De Leon brought Christina home from the hospital a couple of hours later. Defendant told Detective De Leon that Z. had fallen in the backyard. He did not tell him that he had kicked Z. because he knew he would go to jail. Defendant was taken to the police station later that day and gave a second statement.

Defendant was arrested the following day and interviewed again by Detective De Leon at the station. Defendant acknowledged changing his statement and telling Detective De Leon that he had kicked Z. He said he did so because Detective De Leon was accusing him of sodomy.

During cross-examination, defendant denied telling Christina over the phone that it looked like Z. had been "butt raped." Rather, he testified that when Christina first saw Z.'s injury, she said that it "looked like somebody tried to shove an apple in his butt," and defendant responded, "no, it looks like he got butt raped." When asked why he never told Detective De Leon that he had kicked Z. three times, defendant responded, "I didn't figure I had to tell him how many times I kicked him. I told him I kicked him, and that was it."

Towards the end of his cross-examination of defendant, the prosecutor played a recording of Detective De Leon's August 24, 2011, interview with defendant for the jury. At the beginning of the interview, defendant repeatedly stated that he did not touch Z. After Detective De Leon told defendant that Z. had been sodomized, defendant admitted kicking Z. one time. When Detective De Leon asked, "Did you kick him more than once," defendant responded, "No, one time."[4] Defendant also told Detective De Leon that it was a "half-ass kick," not a "full-bore kick." Defendant said he was "in utter shock" when he saw Z.'s injuries and that "it looked like somebody stuck something in him." He told Christina, "You better get home; it looks like he's been raped" and

---

[4] During the interview defendant stated nine times that he kicked Z. once.

9

explained that Z.'s "butt didn't look that way fucking two hours ago." After he saw Z.'s injuries, defendant changed Z.'s diaper, which had blood on it. Defendant repeatedly denied putting anything inside of Z.

On redirect, defendant's trial counsel asked defendant if he intended to hurt Z. when he kicked him, and defendant responded, "I didn't know what I intended to do. I didn't -- my intention before and long after was no intention to hurt anybody."

Defendant's mother also testified for the defense. She had never seen defendant act inappropriately with a child and did not believe he would sexually abuse a child.

Dr. John Wicks, a clinical psychologist, testified as an expert in the area of neuropsychology. He conducted a general psychological assessment of defendant, examined defendant in two 4-hour sessions, reviewed arrest reports and medical records, and spoke to various witnesses, including Christina and defendant's mother. Dr. Wicks opined that defendant did not fit any of the models of a child molester.

## C.    Rebuttal

A mixed martial arts expert testified that martial arts students are taught not to kick with their toes, and that during his career, he had been kicked in the buttocks over 500 times and never suffered an anal laceration or lost the patency of his sphincter muscle.

## DISCUSSION

### I

### Substantial Evidence Supports the Jury's Finding That Defendant "Caus[ed] the Penetration" as Required for Counts 1 (Sexual Penetration) and 7 (Forcible Sexual Penetration)

Defendant first contends that "[a]ssuming that the child suffered anal penetration, there was insufficient evidence to prove that [defendant] was the perpetrator." We disagree.

In reviewing a challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses

10

substantial evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*) We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.)

Counts 1 and 7 both allege that defendant committed sexual penetration within the meaning of section 289. Subdivision (k)(1) of section 289 defines " '[s]exual penetration' " as "the act of causing the penetration, however slight, of the genital or anal opening of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

For purposes of this appeal, defendant does not dispute that there is sufficient evidence of anal penetration. Rather, he contends that there is insufficient evidence that he caused the penetration. More particularly, he asserts that "[b]ecause there was evidence that the boy arrived in Woodland with a pre-existing condition in his private area[, which his mother and grandmother believed to be diaper rash], and because Dr. Rosas testified that the penetrative anal injury could have been inflicted up to five days prior, it was unreasonable for the jury to assume that [defendant] caused the anal penetration . . . ." Defendant's contention is without merit.

There is overwhelming evidence that defendant caused Z.'s anus to be penetrated. Christina left Z. in defendant's care at approximately 10:00 a.m. Approximately two hours later, defendant advised her that Z. had fallen and it looked like he had been "butt raped." When Christina returned home, she looked inside of Z.'s diaper and saw that his skin was swollen and red. When asked if Z.'s "fanny look[ed] like that [two or three hours earlier] when you changed his diaper after his poop," she responded, "Absolutely not." Defendant likewise told Detective De Leon that Z.'s "butt didn't look that way fucking two hours ago." While Dr. Rosas was unable to state whether the injury to Z.'s anus occurred a few hours or a few days before she examined him, she testified that "the

11

injuries would have been very obvious to anybody who saw the child's anus, such as doing a diaper change" and that if Z.'s diaper been changed at 10:00 a.m. that morning, the person who changed it "would have noticed [the injury] at 10:00 o'clock if it had been there." Defendant acknowledged that he was the only person with Z. while Christina was working at the shelter.

Based on the foregoing, the jury easily could have concluded that Z.'s anus was penetrated while he was in defendant's care and that defendant caused the penetration.

II
Any Error in Instructing the Jury in the Language of CALCRIM No. 852 Was Harmless Beyond a Reasonable Doubt

Defendant next contends that the trial court erred in instructing the jury in the language of CALCRIM No. 852 ("Evidence of Uncharged Domestic Violence") because he was not charged with a crime of "domestic violence," and the instruction given allowed the jury to impermissibly infer from a single act of domestic violence that he had a propensity to commit domestic violence, and was likely to commit, and did commit, the crime of sexual penetration of a two year old child. As we shall explain, any error in instructing the jury with CALCRIM No. 852 was harmless beyond a reasonable doubt.

On cross-examination of Christina, defendant's trial counsel elicited testimony regarding a prior incident of domestic violence during which defendant pushed her down, causing her to scrape her hand on the wall. The prosecutor elicited additional testimony regarding the same incident during his cross-examination of defendant.

Prior to instructing the jury, the trial court met with the attorneys to finalize jury instructions. During that meeting, the trial court indicated, "I've got both 375 and 852. They're alternative versions of an instruction about other crimes evidence." The prosecutor indicated that he wanted the court to give CALCRIM No. 852, rather than 375, and the trial court appeared to agree. At that point, defendant's trial counsel sought confirmation from the trial court that it was not going to give CALCRIM No. 375, and

12

the court responded, "Correct." Defendant's trial counsel did not object to the giving of CALCRIM No. 852, and the

trial court instructed the jury in pertinent part as follows: "The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] . . . [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the crimes charged in Counts 1, 2, and 7 as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged in Counts 1, 2, or 7. The People must prove each charge beyond a reasonable doubt."

Generally, a defendant who fails to object to a proposed jury instruction forfeits the right to challenge that instruction on appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 326; *People v. Stone* (2008) 160 Cal.App.4th 323, 331.) Defendant, however, asserts the error is reviewable under section 1259 because it affected his substantial rights. Even assuming that the trial court erred in instructing the jury in the language of CALCRIM No. 852 and that defendant's claim is properly before us, the error was harmless beyond a reasonable doubt. (*People v. Beltran* (2007) 157 Cal.App.4th 235, 247 [holding that the *Chapman*[5] beyond-a-reasonable-doubt standard applies to challenges to instructions erroneously allowing permissive inferences].)

The jury was instructed that if it found that defendant committed the prior act of domestic violence, it *could*, but was not required to, find that defendant was disposed or

---

[5] *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

13

inclined to commit domestic violence. The jury was further instructed that such a finding alone was insufficient to support a finding that defendant committed the crimes charged in counts 1, 2, and 7. Rather, it was instructed that it "*is only one factor to consider along with all the other evidence*" and that the People "*must prove each charge beyond a reasonable doubt.*" (Italics added.) Thus, even assuming the jury found that defendant committed the prior act of domestic violence and as a result was disposed or inclined to commit domestic violence, it could not base its verdict on counts 1, 2, or 7 on that finding alone, but instead had to consider all the other evidence in determining whether the People proved each charge beyond a reasonable doubt. As detailed above, the "other evidence" of defendant's guilt as to counts 1 and 7 was overwhelming.[6] Defendant's claims to the contrary notwithstanding, it is undisputed that the injuries to Z.'s anus were not present when Christina left Z. in defendant's care, and that when she returned approximately two hours later, it appeared to both her and defendant that someone had put, or attempted to put, something inside of Z.'s anus. This conclusion was confirmed by Dr. Rosas, who opined that Z.'s anus had been penetrated by a large object and explained that blunt force trauma alone could not have caused the injuries to Z.'s anus, which included swelling and redness inside the anal canal. In arguing that defendant was guilty of counts 1 and 7, the prosecutor relied solely on the "other evidence." He did not refer to the prior act of domestic violence or CALCRIM No. 852 during his closing argument, much less urge the jury to draw any inference from the prior uncharged act of domestic violence. Rather, it was defendant's trial counsel who introduced the evidence of prior acts of domestic violence in the first instance and referred to the same in her closing argument as proof that defendant simply "lost it in a moment of frustration" and

---

[6] Because the jury found defendant not guilty of count 2, we need not consider the instruction's impact on the jury's finding as to that count.

is not the type of person "who would hit somebody or hurt somebody with a sadistic purpose or to cause pain or pleasure."

On the record before us, we have no trouble concluding beyond a reasonable doubt that the jury would have found defendant guilty of counts 1 and 7 even if it had not been instructed in the language of CALCRIM No. 852.

### III
### Defendant's Ineffective Assistance of Counsel Claim Fails

Defendant next contends that he was denied effective assistance of counsel because his trial counsel failed to object when the prosecutor purportedly misstated the law during closing argument by suggesting that defendant "could be guilty of sexual penetration by doing something that unwittingly causes anal penetration . . . ." (§ 289, subd. (k)(1).) As we shall explain, the record reveals that defense counsel made a reasonable tactical decision to address the prosecutor's statements during her own closing argument, and given her clarification and the court's instructions defendant was not prejudiced by the prosecutor's statements.

In discussing the crime of sexual penetration during his closing argument, the prosecutor stated in pertinent part: "Sexual penetration means penetration, however slight, of the anal opening. However slight. [¶] You can decide that that term however slight can come back to haunt [defendant] and here's how. As smart as he may think he is by changing his testimony in trial away from what he told the officers, as smart as he may think he is, he's not that smart. You know why? Because foreign object means anything. It could mean the tip of a shoe. So guess what? If you want to believe -- if you want to believe that all [he] did was kick this child and he kicked him with the toe of his foot and somehow the toe of this shoe -- because he said he used his right foot, somehow the toe of this right foot penetrated the life-size anal opening that Dr. Rosas drew, if you want to believe that the toe of this shoe penetrated that child's anus, guess what? Guilty of sexual penetration on a child. Does not have to be an object that we

15

know penetrated him. [¶] But he said I kicked him there. I kicked him there. If you decide to believe everything he told us from that witness stand, he is still guilty of sexual penetration with a foreign object, and in that case we know what the object was. It was his shoe. [¶] Now, sexual penetration means penetration, however slight, of the genital or anal opening. Yep, penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort. [¶] Guess what? Doesn't have to be for the sexual gratification because that's not what the element requires I prove. No question there was pain, injury, and discomfort based upon the photographs contained in People's Exhibit 2. I'm not going to put those up. You can look at those in the jury room."

Subdivision (k)(1) of section 289 defines " '[s]exual penetration' " as the "act of causing the penetration, however slight, of the genital or anal opening of any person . . . *for the purpose of* sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." (Italics added.) Thus, defendant is correct that the penetration must be purposeful and cannot be inadvertent.

Attorneys are given wide latitude in conducting closing argument. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 147-148.) A prosecutor exceeds this wide latitude, however, when he or she misstates the applicable law (*People v. Gray* (2005) 37 Cal.4th 168, 217), or argues an improper theory to the jury (*People v. Morales* (2001) 25 Cal.4th 34, 43-46).

As defendant appears to acknowledge, he forfeited a claim of prosecutorial error by failing to object to the challenged comments below (*People v. Crew* (2003) 31 Cal.4th 822, 839), and thus, contends that he was denied effective assistance of counsel by virtue of his trial counsel's failure to object.

To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that his trial counsel's performance fell below the standard of reasonableness and that there is a reasonable probability the result would have been more favorable had his counsel provided adequate representation. (*Strickland v. Washington* (1984) 466 U.S.

16

668, 694 [80 L.Ed.2d 674]; *People v. Johnson* (2016) 62 Cal.4th 600, 653.) "[C]ounsel has wide discretion in choosing the means by which to provide constitutionally adequate representation." (*Johnson,* at p. 653.) " '[A]n appellate court's ability to determine from the record whether an attorney has provided constitutionally deficient legal representation is in the usual case severely hampered by the absence of an explanation of an attorney's strategy.' [Citation.]" (*Ibid.*) Thus, " ' "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" ' " (*Ibid.*)

Here, the record reveals that defense counsel made a tactical decision not to object and to discredit the prosecutor by pointing out his misstatement of the law during her own closing remarks. Defendant's trial counsel argued to the jury: "[O]ne of the waves of emotion that [the prosecutor] was talking about -- guess what? All we have to do is prove that his toe penetrated the area and guess what? He's guilty. That is not -- that is not the law, and I ask you to look at that, because it all goes into his intent on those counts. [¶] You're going to have this. It's instruction -- well, it's on both instructions, 1128 and 1100.[7] They're basically the same definitions for sexual penetration, but penetration for sexual abuse means penetration for the purpose, what he meant, of causing pain, injury, and discomfort." She later repeated her argument that a kick alone was insufficient to support a conviction for sexual penetration, telling the jury: "And if [defendant] lost it and kicked the kid, is he guilty of Counts 1, 2, or 7? No. And, again, I want you to look at those instructions because the penetration for sexual abuse means

---

**7** The trial court instructed the jury in the language of CALCRIM Nos. 1100 and 1128, both of which provide that to constitute sexual penetration, the penetration must be for the purpose of sexual arousal, sexual gratification, or sexual abuse, and that "[p]enetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort."

17

penetration for the purpose of causing pain, injury, or discomfort." Counsel's choice not to object to the prosecutor's argument and to instead clarify the applicable law during her own argument and to direct the jury to the applicable jury instructions was reasonable. Moreover, given defense counsel's clarifying remarks and the trial court's instructions, defendant was not prejudiced by the prosecutor's statements. Accordingly, defendant's ineffective assistance of counsel claim fails.

## IV
## The Trial Court Acted Within Its Discretion in Admitting the Testimony of a Martial Arts Expert, and Any Potential Error Was Harmless

Defendant next contends that the trial court abused its discretion in allowing a martial arts expert to testify, over the defense's objection, that he had been kicked in the buttocks by his opponents over 500 times throughout his career and had never suffered an anal laceration or lost the patency of his sphincter muscle as a result. Defendant claims that such testimony was "totally irrelevant" because it had no tendency in reason to prove or disprove any disputed fact. We disagree and further find that any potential error was harmless.

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " ' "Evidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . .' " ' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1058, quoting *People v. Clark* (2011) 52 Cal.4th 856, 892, overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192.) " '[T]he trial court has broad discretion to determine the relevance of evidence. [Citation.]' " (*Lopez*, at p. 1058, quoting *People v. Cash* (2002) 28 Cal.4th 703, 727.)

18

At trial, defendant admitted kicking Z. three times in the "diaper area" but denied intentionally penetrating Z.'s anus. The defense had various theories as to how Z. sustained the anal injuries testified to by Dr. Rosas, including that the injuries were caused by defendant's kicks. We cannot say that testimony from an individual who had sustained hundreds of very forceful kicks to his buttocks and never suffered an anal laceration or lost the patency of his sphincter muscle did not have *any* tendency in reason to refute the defense's theory. Although, as defendant notes, "[t]here are obvious differences between well-trained adult athletes engaged in martial arts training and competition and an adult kicking a defenseless two-year old child in the rear-end of his diaper," we find that such differences go to the weight and not the admissibility of the evidence here.

Even if we were to find that the trial court erred in admitting the challenged testimony, we nonetheless would conclude that any error in admitting such evidence was harmless under the *Watson* standard. (*People v. Carter* (2005) 36 Cal.4th 1114, 1170 [applying the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 to a claim that trial court erred in admitting evidence].) Under the *Watson* standard, reversal would be warranted only if we conclude that it is reasonably probable the jury would have reached a different result had such testimony been excluded. (*Carter,* at pp. 1170-1171.)

On the record before us, there is no reasonable probability that the jury would have concluded that the penetration of Z.'s anus was merely inadvertent as the defense appeared to suggest or that the injuries to Z.'s anus were otherwise caused by defendant's kicks. Thus, there likewise is no reasonable probability that the jury would have found defendant not guilty of sexual penetration as alleged in counts 1 and 7 had the challenged testimony been excluded. When defendant delivered the kicks, he was wearing tennis shoes and Z. was wearing a diaper. Given those two facts, no juror reasonably could conclude that defendant inadvertently penetrated Z.'s anus when he kicked him in the diaper area. Moreover, Dr. Rosas testified that Z.'s anal injuries were indicative of a

19

"penetrating injury" and explained that if "it was blunt trauma, the severity of the injury would be to the parts of the body that are most at the surface, . . . you wouldn't have bruising at the very edge of the anus or tearing to the anus or overstretching of the muscles of the anus." She further testified that blunt force trauma alone could not cause swelling and redness inside the anal canal.

For the foregoing reasons, it is not reasonably probable that the jury would have reached a different result had the challenged testimony been excluded.

## V
## The Trial Court Instructed the Jury with the Wrong Pattern Instruction on Count 7, but the Error Was Harmless

Defendant next contends that the trial court prejudicially erred by instructing the jury on count 7, forcible sexual penetration of a child in violation of section 289, subdivision (a)(1)(B), in the language of CALCRIM No. 1100, the pattern instruction for sexual penetration for person under 14 under section 289, subdivision (j), a crime not charged in this case. While there is no question the trial court gave the wrong instruction, on the record before us, the error was harmless beyond a reasonable doubt.

Defendant was charged in count 7 with forcible sexual penetration of a child in violation of section 289, subdivision (a)(1)(B), which, as relevant here, provides that "[a]ny person who commits an act of sexual penetration upon a child who is under 14 years of age, when the act is accomplished against the victim's will by means of force, . . . shall be punished . . . ." The applicable pattern instruction for the crime charged in count 7 is CALCRIM No. 1045, which provides in pertinent part: "The defendant is charged [in Count _____] with sexual penetration by force [in violation of Penal Code section 289]. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of sexual penetration with another person; [¶] 2. The penetration was accomplished by using (a/an) (foreign object[,]/ [or] substance[,]/ [or] instrument[,]/ [or] device[,]/ [or] unknown object); [¶] 3. The other

20

person did not consent to the act; [¶] AND [¶] 4. The defendant accomplished the act: [¶] *<Alternative 4A--force or fear>* [¶] [by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.]"

CALCRIM No. 1045 was not given in this case; rather, the jury was instructed in the language of CALCRIM No. 1100, in pertinent part as follows: "To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant participated in an act of sexual penetration of with another person; two, the penetration was accomplished by using a foreign object or substance or instrument or device or an unknown object and, three, at the time of the act the other person was under the age of 14 years and was at least ten years younger than the defendant. [¶] Sexual penetration means penetration, however slight, of the genital or anal opening of another person for the purpose of sexual abuse, arousal, or gratification."

Defendant claims that he was prejudiced by the trial court's use of the wrong pattern instruction because the instruction given (1) eliminated the element of force contained in CALCRIM No. 1045, thereby allowing the jury to "convict [him] of violating Penal Code section 289, subdivision (a)(1)(B), without having to find that he committed the offense by means of force, violence, duress . . ."; and (2) instructed the jury that the offense could be based on "participating" in an act of sexual penetration as opposed to "committing" sexual penetration.

The People essentially concede that the trial court erred in instructing the jury in the language of CALCRIM No. 1100, instead of CALCRIM No. 1045, but assert that the error was harmless beyond a reasonable doubt. We agree.

As the People point out, the penetration of the anal opening of a two-year old child necessarily is by force. In *People v. White* (1986) 179 Cal.App.3d 193, 199-203 (*White*), the Court of Appeal examined the "use of force" requirement contained in former section 289, subdivision (a), now section 289, subdivision (a)(1)(A), which provided: " 'Every person who causes the penetration, however slight, of the genital or anal openings of

21

another person, by any foreign object, substance, instrument, or device, when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person for the purpose of sexual arousal, gratification, or abuse, shall be punished by imprisonment in the state prison for three, six or eight years.' " (*White,* at p. 198.) There, the defendant was convicted of a single count of violation of former section 289, subdivision (a), penetration of the anal opening by a foreign object against the victim's will by force. (*Id.* at p. 195.) On appeal, the defendant argued that there was insufficient evidence to support his conviction because the 17-month-old victim's inability to understand the nature of the act committed against her made her " 'incapable of having the act accomplished against her will.' " (*Id.* at p. 202.) In rejecting the defendant's argument, the court stated: "Penal Code section 261.6 provides: 'In prosecutions under Section 261, 286, 288a, or 289, in which consent is at issue, "consent" shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved.' [¶] Necessarily, where, as here, it is claimed that an act is against the will of a person, 'consent is at issue.' Here, [the victim] was incapable of 'positive cooperation in act or attitude pursuant to an exercise of free will' and was unable to, and did not, 'act freely and voluntarily' with 'knowledge of the nature of the act or transaction involved.' In such a case, the act is as much against the victim's will as if the victim were capable of a free, voluntary and knowledgeable election between alternatives and was prevented from the exercise of that choice by 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury.' And where the proscribed act is committed against the will of a person who is incapable of consent and is accomplished by physical force which results in physical injury to the victim, the statutory requirements 'against the will' and 'use of force' are fully satisfied." (*Ibid.*)

22

Here, Z. was two years old at the time of the incident in question. Accordingly, the proscribed act, the penetration of his anus, necessarily was committed against his will and without his consent. (*White, supra,* 179 Cal.App.3d at p. 202.) Moreover, the jury found true an allegation that defendant inflicted great bodily injury on Z., a child under the age of five, in the commission of count 7. Consequently, the statutory requirements "against the will" and "use of force" were necessarily satisfied. (*Ibid.*) Thus, any error in failing to instruct the jury on the element of force was harmless beyond a reasonable doubt.

Defendant also claims that he was prejudiced because the jury was instructed that the People must prove that he "participated in," as opposed to "committed," an act of sexual penetration, and as a result, could have found defendant guilty of the offense even if it concluded that he "may not have deliberately penetrated the victim's anus." We are not persuaded. As detailed above, the jury was instructed more than once that "[s]exual penetration means penetration, however slight, of the genital or anal opening of the other person *for the purpose of sexual abuse, arousal, or gratification.*" (Italics added.) Thus, the jury was instructed that sexual penetration, by definition is a purposeful act, and one which cannot be done inadvertently. As we recently explained in *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1167, "The crime of sexual penetration of a child 10 years old or younger and the crime of forcible sexual penetration are both specific intent crimes because they require the act of penetration 'to be done with the intent to gain sexual arousal or gratification or to inflict abuse on the victim.' (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1541 [addressing forcible sexual penetration]; see Pen. Code, § 289, subd. (k)(1).)" (Fn. omitted.) In that case we found that the trial court's error in informing the jury that the crimes of sexual penetration of a child and forcible sexual penetration are general intent crimes was harmless beyond a reasonable doubt because "the trial court went on to instruct the jury that to be guilty of each of those crimes, defendant must have committed the act of penetration for the purpose of sexual

23

abuse, arousal, or gratification. *Thus, the trial court actually instructed the jury on the specific intent required for those crimes, despite failing to classify the crimes as specific intent crimes earlier in its instructions.*" (*Id.* at p. 1168, italics added.)

The same is true here. Even assuming the trial court erred in instructing the jury that the People must prove that he "participated in," as opposed to "committed," an act of sexual penetration, the error was harmless beyond a reasonable because the trial court went on to instruct the jury that the act must be done for a specific purpose, and thus, necessarily could not be inadvertent. (*People v. ZarateCastillo, supra,* 244 Cal.App.4th at p. 1168.)

VI

Defendant's One Strike Sentence of Life Imprisonment Without the Possibility of Parole Must Be Reversed

Defendant next claims that "[t]he One Strike sentence of life imprisonment without the possibility of parole was imposed without proper allegations in the accusatory pleadings and without a proper finding in the verdict." The People agree, and so do we.

Defendant was charged in count 7 with forcible sexual penetration of a child under the age of 14 in violation of section 289, subdivision (a)(1)(B). The operative first amended information contained the following enhancement allegations with regard to that count:

"Count Enhancement 7a: It is further alleged that the victim . . . was a child under 14 years of age at the time of the offense within the meaning of Penal Code section 667.61 [subdivision] (j), and the defendant committed the crime alleged in Count 7 under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e).

"Count Enhancement 7b: It is further alleged that during the commission of the felony charged above [defendant] did willfully, unlawfully, and personally inflict great

24

bodily injury upon a child under the age of five . . . within the meaning of Section 122022.7 [subdivision] (d) . . . ."

While not alleged in the operative information, the verdict form for count 7 asked the jury to make a special finding as to whether defendant "inflicted torture on the victim in violation of Penal Code section 206, one of the circumstances specified in subdivision (d) of Section 667.61 [subdivision] (j) as alleged in Count Enhancement 7a of the First Amended Information."

The jury found defendant guilty of count 7, found the great bodily injury allegation true, and fount the torture allegation not true.

Defendant was sentenced to life without the possibility of parole on count 7 pursuant to subdivision 667.61, also known as the "One Strike" law, which "sets forth an alternative, harsher sentencing scheme for certain forcible sex crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 738 (*Mancebo*).) In imposing the One Strike sentence of life without the possibility of parole, the trial court specifically relied on the jury's true finding on the great bodily injury enhancement.

Subdivision (j)(1) of section 667.61 provides in pertinent part, "Any person who is convicted of [sexual penetration, in violation of subdivision (a) of section 289], upon a victim who is a child under 14 years of age under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e), shall be punished by imprisonment in the state prison for life without the possibility of parole." Among the circumstances specified in subdivision (d) are: "(3) The defendant inflicted . . . torture on the victim . . . in the commission of the present offense in violation of Section 205 or 206"; and "(6) The defendant inflicted great bodily injury on the victim . . . in the commission of the present offense in violation of Section . . . 12022.7 . . . ."

Of particular relevance here, subdivision (o) of section 667.61 provides: "The penalties provided in this section shall apply only if the existence of any circumstance

specified in subdivision (d) or (e) *is alleged in the accusatory pleading pursuant to this section, and is either admitted by the defendant in open court or found to be true by the trier of fact.*" (Italics added.) In *Mancebo*, our Supreme Court read this subdivision to require the People to allege in the operative accusatory pleading "which qualifying circumstance or circumstances are being invoked for One Strike sentencing." (*Mancebo, supra,* 27 Cal.4th at p. 752.) "In the Supreme Court's view, this outcome is dictated not only by the language of the One Strike law, but also by due process because 'the fair notice afforded by that pleading requirement may be critical to the defendant's ability to contest the factual bases and truth of the qualifying circumstances'; may be essential for the defendant to assess his sentencing 'exposure'; and may be necessary for the defendant to know what he must admit to if he elects to enter a plea. [Citation.]" (*People v. Perez* (2015) 240 Cal.App.4th 1218, 1223, quoting *Mancebo*, *supra*, 27 Cal.4th at pp. 746–747, 750, 752.)

In *Mancebo*, the information charged the defendant with various sex crimes against multiple victims and alleged firearm use and kidnapping to support an enhancement under section 667.61. (*Mancebo, supra,* 27 Cal.4th at p. 740.) At the sentencing hearing, the trial court sua sponte substituted a multiple-victim circumstance for the firearm-use allegation to support the enhancement under section 667.61 and to free up the firearm-use allegation for use to support other enhancements, even though the multiple-victim circumstance had not been alleged by either statute number or descriptive facts. (*Mancebo,* at p. 740.) Our Supreme Court affirmed the judgment of the Court of Appeal reversing the sentence, holding that the trial court erred when it used an unpled multiple-victim circumstance to support an enhanced sentence under section 667.61. (*Mancebo,* at pp. 739, 742-745, 754.) The court concluded this not only violated the pleading and proof requirements in section 667.61, but also the defendant's right to fair notice under the due process clause. (*Mancebo,* at pp. 753-754.) In doing so, the court observed, "[N]o factual allegation in the information or pleading in the statutory language

26

informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing under section 667.61, subdivision (a). Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under section 667.61, subdivision (a) and use the circumstance of gun use to secure additional enhancements under section 12022.5[, subdivision] (a)." (*Id.* at p. 745.)

The same is true here. None of the circumstances enumerated in section 667.61, subdivisions (d) or (e) were specifically alleged in the operative first amended information (or in any of the prior accusatory pleadings). Rather, with respect to count 7, it was generally alleged that the defendant committed the crimes "alleged in Count 7 under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e)." While the operative information contained a great bodily injury enhancement allegation, which the jury found true, it was not alleged as a qualifying circumstance for purposes of the One Strike law. Thus, the court's reliance on that circumstance in imposing the One Strike sentence of life without the possibility of parole on count 7 violated the pleading requirement of section 667.61, subdivision (o), as well as defendant's rights under the due process clause. (*Mancebo, supra,* 47 Cal.4th at pp. 745, 747; *Perez, supra,* 240 Cal.App.4th at pp. 1224-1227.) Accordingly, the One Strike sentence of life without the possibility of parole on count 7 must be reversed.[8]

---

[8] Because we conclude that defendant's One Strike sentence of life without the possibility of parole on count 7 must be reversed for the reasons stated above, we need not address defendant's contention that the sentence constitutes cruel and unusual punishment.

27

## VII
### The Trial Court Improperly Responded to a Jury Question Concerning the Four Child Abuse Counts, and the Error Was Prejudicial as to Two of Those Counts

Defendant next contends that the trial court prejudicially erred in responding to a jury question concerning the four child abuse counts (counts 3-6). As a result, defendant contends that he only should have been convicted of one count, not four. We agree that the trial court erred in responding to the jury's question, but find that the error was harmless as to two (not one) of the four counts. Accordingly, we shall reverse defendant's convictions on counts 4 and 6.

Defendant was charged in counts 3 through 6 with violating section 273a, subdivision (a), which provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." Each of the four child abuse counts set forth in the operative first amended information contained an allegation that it "encompasses the injury to" a specific body part, namely the scrotum (count 3), tip of the penis (count 4), chest (count 5), and perineum (count 6).

The jury was instructed in the language of CALCRIM No. 821 ("Child Abuse Likely to Produce Great Bodily Harm or Death") in pertinent part as follows: "To prove that defendant is guilty of these crimes, the People must prove that, one, the defendant willfully inflicted unjustifiable physical pain or mental suffering on a child and, two, the defendant inflicted pain or suffering on the child or caused or permitted the child to be injured under circumstances or conditions likely to produce great bodily harm, and three . . ., the defendant did not act while reasonably disciplining a child."

28

During his closing argument, the prosecutor told the jury that "Counts 3, 4, 5, and 6, . . . deal with a separate area of [Z.'s] body that was injured, chest, thigh, scrotum, penis."

During deliberations, the jury sent the court the following question: "Counts 3-6. Do they refer to specific body injury?" Consistent with the operative information, the trial court responded that count 3 "refers to the injury to [Z.'s] scrotum"; count 4 "refers to the injury to [Z.'s] penis"; count 5 "refers to the injury to [Z.'s] chest"; and count 6 refers to the injury to [Z.'s] perineum." Defendant was convicted on all four counts.

As a preliminary matter, the People argue that defendant forfeited his challenge to the trial court's response to the jury's question by failing to object below. Section 1259 provides that the appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Here, defendant claims that the trial court's response to the jury's question violated his substantial rights by "allow[ing] the jury to find [him] guilty of multiple offenses where the facts allow for only one offense. . . ." We will therefore consider defendant's claim on the merits, even though he should have initially raised it in the trial court.

As both sides acknowledge, "a charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute -- the gravamen of the offense -- has been committed more than once." (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349, superseded by statute on other grounds as stated in *People v. Arndt* (1999) 76 Cal.App.4th 387, 393-394.) The actus reus for the crimes charged in counts 3 through 6 is the infliction of unjustifiable physical pain or mental suffering on a child. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1222-1224; see also *People v. Valdez* (2002) 27 Cal.4th 778, 786.) The actus reus for the crimes charged in counts 3 through 6 is complete upon the infliction of unjustifiable physical pain or mental suffering. (See *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477.) Thus, where multiple

applications of physical force result in unjustifiable physical pain, the perpetrator has completed multiple violations of section 273a, subdivision (a), even when the successive acts of violence are committed during a single incident. (See *People v. Johnson,* at p. 1477.)

Defendant contends that "[b]ecause the actus reus of the offense is the infliction of physical pain or mental suffering, rather than the infliction of any specific injury, it was error to instruct the jury that the four counts were defined, and could be distinguished from one another, based on the particular body part that was injured." We agree. After receiving the trial court's response to their question, the jury could have mistakenly believed that it could find defendant guilty of multiple violations of section 273a, subdivision (a) based on a single infliction of unjustifiable physical pain so long as the single infliction resulted in the specified injuries.

Having found the trial court erred in responding to the jury's question, we must determine whether defendant was prejudiced by the error. While defendant admits kicking Z. three times, he contends that he is guilty of only one count of child abuse. He asserts that had the jury not been misled, it "could have found that there was no opportunity to reflect between kicks" and thus, "even though different parts of the body may have been injured[,] . . . the single episode of kicking amounted to one violation Penal Code section 273a, subdivision (a)." We are not persuaded.

Defendant admitted kicking Z. three times. Dr. Rosas testified that while the injuries to defendant's scrotum, penis, and perineum (counts 3, 4, & 6) may have been inflicted by a single kick,[9] the injury to his chest (count 5) was separate. According to Dr. Rosas, there had to be at least two kicks. Given defendant's admission and Dr. Rosas's testimony, we find that the trial court's error was harmless beyond a reasonable

---

[9]  At sentencing, the prosecutor acknowledged that the injuries to the scrotum and perineum could have been caused by a single kick.

doubt as to count 5, which encompassed the injury to the chest, and to one of the other child abuse counts which necessarily involved a separate kick. In other words, we find beyond a reasonable doubt that had the jury been properly instructed, it would have found him guilty of count 5 and at least one other child abuse count. Accordingly, we shall reverse defendant's convictions on counts 4 and 6 only.

VIII
Defendant's Sentence on One of the Two Remaining Child Abuse Convictions Must Be Stayed

Defendant next contends that the trial court erred in failing to stay his sentences on all of the child abuse counts under section 654 because all of the offenses, including forcible anal penetration (count 7), were committed "during the same course of conduct, with the same objective and intent (i.e., to inflict pain or suffering)." The People agree that defendant's sentence on count 5 should have been stayed, but not his sentences on counts 3 and 4. As previously discussed, defendant's convictions on counts 4 and 6 must be reversed, and the trial court stayed defendant's sentence on count 1. Accordingly, we are concerned only with defendant's sentences on counts 3 and 5. As we shall explain, the trial court did not err in declining to stay defendant's sentence on count 3 because even assuming the kicks and the penetration were aimed at one intent and objective, i.e. to inflict pain on Z., there is evidence that they did not constitute an indivisible course of conduct. The trial court did, however, err in failing to stay defendant's sentence on count 5 because counts 3 and 5 were aimed at one intent and objective and constituted one indivisible course of conduct for purposes of section 654.

Subdivision (a) of section 654 provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Even though section 654 refers to '[a]n act or omission,' in *Neal v. State of California* (1960) 55

31

Cal.2d 11, the California Supreme Court 'opined that "[f]ew if any crimes . . . are the result of a single physical act." [Citation.] Accordingly, the relevant question is typically whether a defendant's " 'course of conduct . . . comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' " [Citation.] To resolve this question, the *Neal* court announced the following test: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' [Citation.]" (*People v. Goode* (2015) 243 Cal.App.4th 484, 492.) Since *Neal,* however, courts " 'have refined and limited application of the "one intent and objective" test, in part because of concerns that the test often defeats its own purpose because it does not necessarily ensure that a defendant's punishment will be commensurate with his culpability.' [Citation.] For example, in *People v. Beamon* (1973) 8 Cal.3d 625, disapproved on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, the Supreme Court stated 'that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.' (*Beamon*, at p. 639, fn. 11.) 'Thus, a finding that multiple offenses were aimed at one intent and objective does not necessarily mean that they constituted "one indivisible course of conduct" for purposes of section 654. If the offenses were committed on different occasions, they may be punished separately.' [Citation.]" (*Goode,* at p. 492.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably

deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Here, the only evidence is that defendant delivered the three kicks in succession in response to Z.'s crying. Thus, we agree with the parties that the conduct that forms the basis of counts 3 and 5, the kicks, were aimed at one intent and objective and constituted one indivisible course of conduct for purposes of section 654.

Unlike counts 3 and 5, count 7 did not involve a kick, but the forcible penetration of Z.'s anus, which, according to the evidence, would have required removing Z.'s diaper and inserting a large object into Z.'s anus. On this record, the trial court reasonably could have concluded that the conduct that forms the basis of counts 3 and 5 on the one hand and count 7 on the other did not constitute an indivisible course of conduct. Thus, the trial court erred in failing to stay defendant's sentence on all but one of the four child abuse counts.

IX

The Abstract of Judgment Contains a Clerical Error

Finally, defendant contends and the People agree that the abstract of judgment should be corrected to reflect that defendant was convicted in count 1 of violating section 288.7, subdivision (b), not section 288.7, subdivision (a). We agree.

Defendant was charged in count 1 with violating section 288.7, subdivision (b) and was convicted of that offense. The abstract of judgment incorrectly reflects that defendant was convicted of section 288.7, subdivision (a). This clerical error must be corrected on remand.

DISPOSITION

The judgment is modified by striking the sentence imposed under the One Strike law as to count 7, to vacate defendant's convictions on counts 4 and 6, and to stay defendant's sentence on count 5 pursuant to section 654. The matter is remanded for resentencing on count 7, and the clerk of the court is directed to prepare an amended

33

abstract of judgment reflecting that defendant was convicted on count 1 of violating section 288.7, subdivision (b) (not subdivision (a)).  In all other respects, the judgment is affirmed.


　　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　　　Blease, Acting P. J.


We concur:


　/s/
Murray, J.


　/s/
Renner, J.